and our next case will be Maxell also v. Amperex 23-2257. Mr. Shulman, this is a different case. Troy is the same reference. No adds a fluoro compound and I'll give you a case, as you see fit, but no need for repetition. That's unnecessary. Understood. Thank you. That's right. This is the O3-5 patent and it is exceedingly similar to the patents we just discussed. The only difference is that like the 4-4-6, the O3-5 requires magnesium with another element and second, instead of the dinitrile, as you noted, it requires a fluorine containing organic solvent. Same set of issues here, but something I'd like to return to is the selection of magnesium and aluminum here. Although Dr. Luck did testify about aluminum, he testified about aluminum being part of these larger materials, NCA, that were at higher percentages than one might consider to be dopants. So even though it was known perhaps that aluminum could be used in these batteries, I don't think it's accurate that Dr. Luck necessarily testified that they were at the level of dopants. That's at Appendix 29-82, page 117-22 are the lines. But along those lines, the selection of magnesium and aluminum, the way that the board then went into the result-effective variable analysis is also not supported by substantial evidence here. The application of that law of overlapping ranges and routine optimization is inappropriate in this case, because it does not invite inventors to simply select a narrow range from within a broader range that is disclosed in the prior art. Again, Choi's range is very, very broad, and under Moderna TX, the assumptions that needed to go in to whittle that down to just magnesium and aluminum are unsupported. The court in Moderna TX found flawed the assumption that you could set the amount of any one of these components at whatever you want, because the property of the overall particle requires a view of the particle as a whole. Similarly here, these formulas are dependent on numerous components, and it's inappropriate to set, to pluck one out and say that we'll set that at any amount that we want. So the routine optimization that the board engaged in here is not simply a matter of narrowing a large range to a smaller range. It's first making a bunch of assumptions about how you would get there to select magnesium and aluminum. So that sort of breadth and those assumptions taken out of the typical case and put in a case more like genetics, where the options in the prior art numbered in the tens of thousands, 68,000 potential options. And the court reasoned that that breadth, coupled with the fact that in the prior art there were different ways to select those proteins, different locations that the proteins could be, and the allowance of substitutions of those underlying proteins, that disclosed a range that was so broad that it was encompassed a large number of compositions that required a non-obvious invention. Similarly here, choice formula is so broad, and the formula, the differences between the formulas include the selection of elements, their required elements, and then their allowed compositions. That results in a vast number of compositions, similarly to genetics, where you can't, it's too broad, it encompasses too many options. What about your claim one? M2 represents magnesium and another element from titanium, zirconium, germanium, niobium, etc. And then M3, I see two lines of elements, there must be 20 elements there. Right. That's a broad claim. It's a very broad claim, but the alleged overlap between that claim and the prior art is very, very small. And to arrive at that, and to arrive at that tiny overlap from the broad prior art, that's the issue that the board addressed, and that's the part that we have trouble with under the jurisprudence of genetics and Merit NRTX. To get to that tiny overlap, you have to select from such a vast set of options. The cases where that are more typical are cited by the board here, in Ray Peterson and in Ray Harris. You look at those and what you see is in the claims, you have a series of metallic elements and compositions, and then you go into the prior art and every single one of the elements that is claimed is present in the prior art in an overlapping range that overlaps with the claim. There's a direct one-to-one comparison all the way down the line. That comparison is not possible here because, to your point, the claim limitation is very broad, choice is very broad, and if you try to do a one-to-one comparison between the two of them, most of that comparison is empty. It's only this one small theoretical overlap. You're saying the haystacks are different. The haystacks are mostly different. Largely different. There are a couple of pieces of hay intermingled amongst the stacks, and that's the problem. How do you find those two pieces? Is there motivation to do that? I thought we explored that in the prior appeal about how there was all sorts of references that show why you would have very limited concentrations of magnesium and aluminum. What expert testimony do you have that indicates, number one, wow, this concentration range is really broad, 0 to 0.5 or whatever the range is? And likewise, is there any expert testimony that says, no, you wouldn't have just a very small amount of magnesium and aluminum that fits within this claimed range. A skilled artisan would not be motivated to go down that far. Is there any expert testimony like that? I didn't see any. Dr. Lucht, in his declarations, does state that the broad range of choice is too broad for a person of skill to want to have gone in and selected the very narrow range of the claim. I believe he also testified to that. And I apologize, I lost the first part of your question. The range of concentration in Choi is really extraordinarily broad. I didn't see something that said, this is a very broad range. I know you say that to us, but I didn't see the expert say that to us, nor did I see something that said, you would not narrow down Choi's disclosed range to something within the claimed range in spite of the references that disclosed to the contrary. Right. So, what Dr. Lucht did include in his declaration was, I think, a paragraph 40 that's on Appendix 3369, that the larger range of Choi provides, and Choi itself provides no reason for a person of skill to select the smaller amount of magnesium that falls within that range. So, I take your point. I don't think there was any specific testimony that you are looking for, but the breadth of Choi is not just in the numerical range itself. It's also in the selection of the elements. And I believe, also in Dr. Lucht's declaration, he describes the breadth of that selection. And so, again, the breadth is that first you have to select from amongst one or more of up to 25 elements to satisfy Choi's M, and then you have to figure out the concentration of that total amalgamation of those elements. And so, that's the breadth. I want to save the rest of your time. I'd like to hit one more point, if I could, which is that even if you were to accept sort of the overlapping ranges framework, the result-effective variable analysis here also has a couple of issues, because the board limited its analysis to two of the potential variables that are available. And so, if you accept that magnesium and aluminum are result-effective variables, that requires accepting that the remaining components of Choi are also result-effective variables. And that's an issue, because under Moderna TX, again, there were four components to that particle, and showing that one of them was result-effective required an understanding that all four were result-effective. And so, what was lacking there was a showing that reaching the claimed range for all four of those result-effective variables would have been achievable through routine optimization. Similarly here, Choi has multiple components beyond magnesium and aluminum, including the base element, excuse me, the base metal. I thought Moderna TX was about the problem that we could not reasonably discern what the disclosed range would be, given all the moving parts and dynamics of the different elements of the claimed composition. It doesn't. And I don't, here we do have a disclosed range in Choi. It's very specific about what its respective M would be. It's 0 to 0.5. Right. Moderna TX actually does both. First, it discusses how it's inappropriate to assume what the range of that one of four components is, even though all four add up to 100 percent. It talks about that being a problem based on the assumptions that are made to do that. And it also talks about the result-effective variable analysis and how it was also inappropriate to show just one variable amongst four result-effective. And similarly here, Choi has multiple elements that add up to its total formula, and the board only accounted for magnesium and aluminum, setting aside the base metals, setting aside the X, and just assuming you could optimize around magnesium and aluminum. So with that, thank you. I'll reserve the remainder. We will save it for you. Mr. Cox, please. Thank you, Your Honor. So first, I want to address the Moderna TX case. As Your Honor indicated, that case was a different case entirely than what we have here. That case involved a series of unsupported assumptions about three different ranges that the parties in that case had to argue were result-effective variables in order to get to an undisclosed range. The range that was claimed in that patent was not disclosed in the piece of prior art, and so they had to get to what that range would be by a series of inferences involving the other three lipids. So they said, okay, these all add up to 100. Lipid A discloses this range. Lipid B will assume is this range. Lipid C will assume is this range. And so that was a range that was not disclosed, whereas here, the range of M2 in Choi is clearly disclosed, is clearly between 0 and 0.5, which there's no dispute fully overlaps with the claimed range in this patent. The argument that all of the other 23 elements are result-effective variables and that there should have been testimony about how to adjust those was not raised before the board. That's a new argument that we're seeing in this appeal, and we believe that's been forfeited. But even in the event that it hasn't been forfeited, there is substantial evidence for why a person of skill in the art would select zero of any of those other 23 elements due to the size of those elements, due to the oxidation states of those elements, and due to the cost, all three of which are factors that Dr. Lucht admitted are considerations that a person of skill in the art would consider when determining which dopants to use. The Peterson case was a case that involved an overlapping range, and even though the patent owner in that case showed unexpected results for 2% rhenium because the claimed range was 1% to 3% rhenium, the court found that that evidence of unexpected results or teaching away was insufficient to rebut the presumption that a disclosed range of a result-effective variable leads to the kind of optimization that is routine and that scientists routinely employ in order to get to the desired amounts. My colleague said that Dr. Lucht said that the amount of aluminum that was common and used in the prior art was not a dopant, and while he did repeat that multiple times in his deposition, that the aluminum concentration at issue in that what he admits was a prior art product and was commonly used was 0.05, and so whether he agrees or disagrees that a 0.05 concentration is a dopant or something else, what is without question is that the concentration of aluminum in that prior art was within the claimed range, and that's in appendix 3478 to 3479. What we see here is we have overlapping ranges. We have absolutely no evidence presented of criticality, teaching away, or unexpected results. The evidence below shows that using a concentration at these lower ranges would have been desirable, would have been preferable, and I did not hear any argument from my colleague about the fluorine-containing additive of no being a reason to distinguish this appeal from the appeal that we just heard, and for that reason, I think these cases should rise and fall together, and frankly, I think they should rise together for us, but the last thing I want to say is that we have admissions, again, that improving thermal stability was a common goal, and as your honor mentioned, it's not. These are volatile materials, and we're talking about battery safety. We're talking about reducing battery overheating in the event of gas generation at the perimeter of the cathode, things that, whether through physical impact or overheating, could lead to explosions, and so, of course, for that kind of reason, the justification for seeking to always improve the thermal stability and the physical this, again, is not a build a better mousetrap type of case. The mechanism for enhancing the safety of the battery by creating a protective layer around the anode that McMillan says is created when you use a fluorine additive together in a battery electrolyte solution is substantial evidence supported by the testimony by Dr. Van Shokwik that you would seek to combine these references. Well, there would be more patient to combine. That's correct, your honor. Lastly, you know, the concession by counsel before the board that there is nothing in the record that says that thermal stability could not be further improved. That was about dinitriles, but it, again, relates here to adding fluorine to the cathode of CHOI. Okay. Unless your honors have further questions, I'll ask that the court affirm the decisions below. No one loses points by not using up all their time. Mr. Shulman has a little rebuttal time. Yes, thank you, your honor. Circling back about Dr. Luck's testimony, I also wanted to point out another reference of his in his declaration. He stated at appendix 3369, at paragraph 39, that limiting the amount of the magnesium containing M2 to the small range of 0.002 to 0.05 is critical to the 035 patent. The last point here is, as we heard again here, everybody agrees that these are common goals, that thermal stability is a common goal, and under active video and cardiac, simply having the desire to further improve something is insufficient to form motivation to combine. And lastly, the counsel's remark that you couldn't further improve thermal, that there's nothing to show that thermal stability couldn't be further improved, that's not to say that just because something could be further improved, that there is intrinsically a motivation to combine those two items, and that was the issue addressed in active video. Just because it could be better is insufficient to form a motivation to combine. And so, in closing, thank you for your time, and Maxell urges you to overturn these findings and return the issue to the board. Thank you. Thank you to both counsel. The case is submitted, and that concludes today's arguments. Thank you, your honors.